MAKAR, J.,
specially concurring.
This case is unusual, in part, because of the incentives established under the Florida Birth-Related Neurological Injury Compensation Association (“NICA”) statute, sections 766.301-316, Florida Statutes, which sets forth an administrative process for infants who sustain severe birth-related neurological injuries to establish their eligibility for NICA plan benefits. Emma Johnston suffered permanent and substantial physical impairments arising from her birth in 2007. To be eligible for statutory benefits under NICA, Emma — through her parents — need only show in the administrative hearing below that she also suffered a permanent and substantial mental impairment, all other pre-requisites having been established.
Ordinarily, the incentive under these circumstances would be for Emma’s parents to be supportive of their daughter’s eligibility for the statutory benefits, which would be provided with certainty for life without the risk inherent in bringing a medical malpractice case, which the NICA no-fault remedy displaces. Her parents (and NICA), however, opposed the efforts of intervenor Baptist Medical Center to establish that Emma’s mental impairments were both permanent and severe as the statute requires. One reason for the counter-intuitive behavior of the parties is reflected in a recent comprehensive study of Florida’s NICA system in conjunction with a similar program in Virginia. The study stated:
[I]n Florida, there has been a strong incentive to escape NICA’s jurisdiction and pursue remedies in the tort system for claims that families and their attor *788 neys believe have strong chances of success as negligence actions. No cap on malpractice awards existed there until 2003, when a complicated sliding scale for non-economic damages was introduced. Thus, in Florida, considerably larger awards have been potentially available from juries in birth-related injury litigation. How the sliding scale will impact claiming behavior under NICA is unclear at this stage.
Gil Siegal, Michelle M. Mello & David M. Studdert, Adjudicating Severe Birth Injury Claims in Florida and Virginia: The Experience of a Landmark Experiment in Personal Injury Compensation, 34 Am. J.L. & Med. 493, 499 (2008) (footnote omitted).
In essence, a hospital or physician may be trying to push an injured child into the NICA program (to avoid a potential lawsuit) while the child’s parents are opposing that effort (to pursue a tort claim against the hospital or physician); indeed, a recent article provides twelve ways for potential claimants to avoid the NICA plan and pursue claims in circuit court. See Jon Gilbert, Twelve Ways to Avoid a Determination of NICA Compensability in a Medical Malpractice Case, 85 Fla. B.J. 42 (Dec.2011) (noting that “statutorily capped remedies provided by NICA are significant limitations compared to the potential damages at issue in circuit court” making it “important to verify that each case abated to NICA is appropriately before the ALJ.”). NICA is the gatekeeper stuck in the middle, attempting to meet its statutory purpose of providing benefits to a limited class of the most severely injured infants while concurrently maintaining the plan’s fiscal stability.
Given the competing incentives and dynamics, it is unsurprising that parties may seem to have lined up on the wrong sides of the playing field. That is what happened here, where the sole issue on appeal is whether the hospital’s evidence demonstrated that Emma’s mental impairments were permanent and substantial; the hospital says they were, the parents and NICA say they were not.
How to prove or disprove that these types of impairments exist in an infant and that they are permanent and substantial (versus some lesser standard such as long-lasting and significant), involves medical prognostications by experts who necessarily have only a temporally short medical history of the infant and a seemingly vast horizon of potential future outcomes. This type of assessment, if based on a one-time medical examination of the infant, is fraught with predictive perils. As the study stated:
Further complicating matters, assessments of both physical and mental disability call for prognosis of the child’s future condition and needs, an exercise that can be quite speculative and uncertain. The term “permanent” suggests that the disability is static over time, but some young children may improve physically and/or mentally as they develop. This possibility raises the question of whether to perform a reevaluation at a later time, as is routinely done in workers’ compensation, or to defer the evaluation for a year.
Siegel et al., supra, at 512 (footnote omitted). Adding more uncertainty to the dynamics of proof, the report notes that a “rigid adherence to a scientific standard of proof’ in the administrative process could “reduce eligible claims quite dramatically, and seriously undermine the programs’ ability to meet their objective of preempting tort claims.” Id. at 506. In other words, replicating tort standards of proof in the administrative forum could simply result in claimants preferring the tort system (particularly those with high-valued *789 claims), which would defeat the “foundational objectives” of the program, a primary one of which is to “help stabilize the malpractice litigation environment ... by effectively wresting disputes over severe birth-related neurological injury, traditionally a tinderbox for medico-legal activity, from the courts.” Id. The report provides insights into how the Florida NICA program is structured and how it might be improved, but the question in this appeal is one of law and not of legislative policy.
Turning to the evidence admitted at trial, it showed generally that Emma has potentially long-term and significant mental impairments with no certainty of improvements; the gravity of her impairments is clearly momentous however the record is viewed. The dispute, however, centered on whether the impairments are “permanent” and “substantial,” which is why the hospital sought to admit as substantive evidence the contested second report of Dr. Trevor Resnick, a pediatric neurologist and the only physician in the proceeding who actually examined Emma (he did an independent medical examination when she was 3 1/2 years old). Dr. Resnick’s first report, which was admitted in evidence by stipulation, was less than unequivocal on whether Emma’s mental impairments were permanent and substantial, but his second concluded they were; the second report was much more detailed, noting that Emma exhibits “no communication skills” and “little if any comprehension, indicating the degree of her mental impairment.” The parents sought to undermine Dr. Resnick’s first report because he initially left open the question of Emma’s potential for progress; this reticence is less a reflection on his predictive ability and more about the enormous grey area of uncertainty any expert would face in making a one-time, conclusive prognosis at Emma’s tender age. As to this second report (which was admitted over objection but deemed hearsay and not used for fact-finding purposes), it appears that Emma’s attorneys knew about it in advance of the hearing, as they acknowledged that both the first and second reports had identical dates, which caused confusion for obvious reasons. But there is enough other confusion surrounding the attempted use of the second report as substantive evidence to render the administrative law judge’s decision to consider it hearsay a judgment call measured by the abuse of discretion standard. Maddox v. Dept. of Prof. Reg., 592 So.2d 717, 719 (Fla. 1st DCA 1991) (holding that hearing officer’s exclusion of evidence not an abuse of discretion). The better course may have been to admit the second report for all purposes, and give it the weight the administrative law judge felt it deserved; but the failure to do so, while a close call, is not reversible error under the standard by which this Court is bound.
Even if the disputed report was available for fact-finding purposes, it would ultimately fall upon the shoulders of the administrative law judge to decide whether the statutory requirement of a permanent and substantial mental impairment was met. This again is a discretionary judgment call in which the hospital’s evidence could be accepted or rejected by the administrative law judge, a determination that is deemed “conclusive and binding as to all questions of fact.” § 766. 311(1), Fla. Stat. While the evidentiary scales may appear from the appellate perch to tip in favor of one party versus another, it is generally improper to second-guess the fact-finder’s determinations to the contrary. Wallace Corp. v. City of Miami Beach, 793 So.2d 1134, 1140 (Fla. 1st DCA 2001). Admittedly, the administrative law judge all but wiped the evidentiary slate clean by relegating the second report to hearsay status, nullifying much of the hos *790 pital’s case. And referring to the prefatory language in the preamble of the NICA statute to conclude that a “substantial” impairment is akin to a “catastrophic” injury versus merely a “mild” or “moderate” one did not help matters; in doing so, the administrative law judge made this case an even closer call on appeal. But even if the second report had been considered for fact finding purposes, it is not clear from the record that the battle would have ended any differently. See § 59.041, Fla. Stat. (2012).